McCORMICK HARVESTING MACH. CO. v. C. AULTMAN & CO. et al.

SAME v. AULTMAN, MILLER & CO. et al.

(Circuit Court, N. D. Ohio, E. D. June 27, 1893.)

Nos. 4,484, 4,485.

1. PATENTS FOR INVENTIONS—REISSUE PROCEEDINGS—REJECTION OF ORIGINAL CLAIMS.

Where a patentee voluntarily resubmits his patent to the examination and revision of the patent office, and then acquiesces in the rejection of claims, or in a construction which narrows or restricts them, the same principles apply as in the case of acquiescence in rejection on original proceedings.

2. SAME—RESTRICTION OF CLAIMS—REFERENCE LETTERS.

Where the elements which go to make up the combination of a claim are mentioned specifically and by reference letters, such specific reference operates to restrict the claim to the particular devices described.

3. SAME—SUBSEQUENT APPLICATION FOR SIMILAR DEVICE.

Where a claim alleged to be infringed describes a specific device, the fact that the patentee subsequently procured another patent for a different device, which defendant's device resembles, must be considered as at least a recognition on the part of the patentee and of the patent office

that there is a patentable difference between the two, which may fairly be invoked to limit the claim to the specific device.

**4. SAME—INVENTION—ANTICIPATION—GRAIN BINDERS.**

Reissued letters patent No. 10,106, granted May 9, 1882, to William R. Baker, for a grain binder having the "combination, with the grain receptacle and supporting bar which carries the tripping fingers of locking mechanism which holds said bar positively against movement away from the receptacle until the tripping fingers have started the binding mechanism," are void for want of invention, and because the specific locking device was anticipated by the patent to John F. Appleby of June 1, 1869, and the S. D. Locke patent of December 7, 1869.

**5. SAME—REISSUES.**

Claims 3, 10, 11, 25, and 26 of letters patent No. 159,506, issued February 9, 1875, to M. L. Gorham, for a grain binder, are void, because, having been embodied substantially in a subsequent application for a reissue, together with certain broader claims, they were rejected by the examiner on reference to various prior patents, and no appeal was taken therefrom, but the rejection was acquiesced in by the patentee, who subsequently obtained a return of the original patent, leaving the decision of the examiner in full force.

**6. SAME—RESTRICTION OF CLAIMS—REISSUE PROCEEDINGS.**

Even if the said claims survived the revisory action and rejection by the patent office under the reissue application, still, the unsuccessful attempt made to broaden them must be held to so limit and restrict their construction as to exclude what was thus rejected, and to confine them to the specific devices and combinations therein described.

**7. SAME.**

Aside from the limitation placed upon them by the proceedings on the reissue application, claims 3, 10, 11, 25, and 26 of the Gorham patent for a grain binder are limited by their terms, and by the prior art, to the specific devices therein described.

In Equity. These were suits for the infringement of reissued letters patent No. 10,106, granted May 9, 1882, to W. R. Baker, for a "harvester binder," and original letters patent No. 159,506, issued February 9, 1875, to Marquis L. Gorham, for an "improvement in grain binders." Bills dismissed.

The material parts of the Baker specifications were as follows:

"The invention relates to that class of binders in which the gavel is automatically seized and bound, and more particularly to the type represented, for example, in letters patent of the United States to John F. Appleby dated February 18, 1879, (No. 212,420.) In this special type, packing arms or fingers are arranged usually below the chute board, and operate through slots therein to pack or compress the grain into a receptacle preparatory to binding. At the bottom of the receptacle the grain is received, and partially supported upon pivoted fingers or bars, against which it is pressed by the packers in the formation of the bundle; and, when sufficient grain is so compressed to form the bundle, the force against the fingers causes them to rock or move backward a short distance. In making this backward movement, the fingers are arranged to trip and set in motion the machinery which operates the binding arm, and also, in some cases, to stop the packers while the bundle is being bound and discharged. Said fingers are carried upon or near the free end of a hinged bar or rod, which swings or yields downward beneath the table or chute board to withdraw the fingers from the path of the sheaf at the conclusion of the binding operation, and permit it to be discharged. My invention has reference to the mode of supporting this bar or rod to which the tripping fingers opposing the packers are pivoted; and it consists in the provision of means whereby said bar is rigidly locked against downward play or yielding until the binding mechanism has been tripped by the action of the fingers, and in the special combinations hereinafter pointed out and claimed. In the drawings, Fig. 1 is a longitudinal sec-

tion of the chute board, through the slot in which the binding arm operates, showing a side view of the binding arm and one of the supporting fingers in the position which these parts occupy when the packers are in operation. The dotted lines show the backward position of the fingers, and the elevation of the trip lever. Fig. 2 is a view on the same section as Fig. 1, with the parts shown in the operation of binding and discharging the bundle, the dotted lines showing the position of the fingers when the bundle is being discharged. * * *

Fig 1.

Fig 2.

"A designates the chute board; B, the binding arm; C, the tripping fingers, which stand in the machine opposite to the packers, which are not shown. D is a portion of the supporting frame of the machine. The chute board is arranged upon the harvester at an incline of about twenty degrees (more or less) from a horizontal, with its elevated end next to the grain elevator of the harvester, so that the grain, as it falls, will be caught thereon, and will slide down towards the tripping fingers, and be stopped by them. E designates

the bar or rod to which the tripping fingers are pivoted by a pivot, e. This bar is hinged to a heel extension of the binding arm by an eye, $c^2$, on said arm, and a pin, $e'$, fixed on the bar, and passing through the eye. The bar is supported in the position shown in Fig. 1 by a spring, $b^1$, acting through shaft, $b$, and cranks, $b'$, $b^3$, and pitman rod, $b^5$, against the body of the arm. The machinery is tripped by the grain pressing the finger, C, back to the position shown in dotted lines, Fig. 1. In doing this the finger rocks on pivot, e, and elevates the projecting lug, $a^2$, on the bottom of the finger, which raises the tripping lever, $a'$, attached to shaft, 3. The binding arm is operated by a rock shaft, a, set in motion, as is the remainder of the intermediate binding mechanism, by the tripping of the clutch through these instrumentalities.

"All of the parts, as thus illustrated and described, are not materially different from those well known in the class of machines to which reference is made. In all machines of this class, the bar or rod, E, which carries the fingers which cause the tripping of the machine, is supported by a spring support similar to that shown in Fig. 4; and it not unfrequently happens, when the grain is damp or green, and from other causes, that the pressure of the grain against the bottom of the tripping fingers will cause the spring support to yield before the pressure at the top of the fingers is sufficient to cause their backward or rocking movement upon their pivot. The yielding of the spring in this manner allows that end of the bar, E, to which the fingers are pivoted to be borne down and lowered in its position, so that the backward movement of the fingers, taking place after such lowering, will not elevate the trip lever, and hence the binding mechanism will not be started, nor, where the packers are to be stopped, will they be thrown out of action, and the machine will clog. To avoid this difficulty, and remedy the defect, I lock the supporting bar positively against descent until the tripping movement of the fingers takes place, for this purpose making the hinge between the binding arm or its rock shaft, and the finger support, E, such as to support this bar in the position shown in Fig. 1, irrespective of the spring support; that is, the hinge is made entirely rigid at this point, so that it will not allow the other end of the bar to drop any lower, whether it has or has not other support. This rigidity of the hinge at the point desired is best secured by means of a pin or lug, c, upon the bar, E, and a lip or projection, $c'$, upon the eye, $c^2$, arranged to meet at the point desired, and prevent any further turning of the hinge. This affords a reliable support to said bar, and insures the tripping of the mechanism under all circumstances. As soon as the fingers have operated the trip, the binding arm starts upon its upward movement, thus breaking the lock by carrying the lip, $c'$, away from the pin, c, and the bar is free thereafter to be lowered at the proper moment to allow the discharge of the bound bundle. The return of the binding arm to its first position renews the lock at the moment the clutch is thrown out, and the parts will be again ready for a fresh binding operation.

"I claim as my invention: (1) In a grain binder, the combination with the grain receptacle and supporting bar, which carries the tripping fingers, of locking mechanism, which holds said bar positively against movement away from the receptacle until the tripping fingers have started the binding mechanism. (2) In a grain binder, the combination with the trip lever, the yielding tripping fingers, and the spring-supported bar which carries said fingers, of locking mechanism which positively stops the arm from yielding against the stress of the spring until the trip lever has been actuated by the fingers. (3) In a grain binder, the combination with the vibrating binding arm, the tripping finger or fingers, and the supporting bar which carries the latter, of a hinge connection between said binding arm and supporting bar rigid in one direction, whereby the bar is locked against yielding or sagging when the binding arm is down. (4) In a grain binder, the combination of the trip lever, the tripping fingers, the supporting bar which carries the latter, the vibrating binding arm, and a hinge connection between said binding arm and supporting bar adapted to lock the latter against yielding away from the grain receptacle until the trip lever has been actuated, and the binding mechanism started. (5) In a grain binder, a support, E, for the compressing and tripping fingers, C, hinged to the binding arm, in combination with a pin, c, on sup-

port, E, and a lip, c', on the binding arm, all arranged to operate substantially as and for the purpose specified."

Parkinson & Parkinson, for complainant.

Banning & Banning & Payson, U. L. Marvin, and Edmund Wetmore, for defendants.

JACKSON, Circuit Judge. In these causes, heard together, the court, after careful examination of the evidence, and full consideration of the questions presented, (which it is not deemed necessary to set out or review in detail,) has reached the following conclusions, viz.:

First, that complainant is entitled to no relief on the William R. Baker reissue patent, No. 10,106, dated May 9, 1882, because the invention sought to be covered by said patent, both original and reissue, is void for want of patentable novelty; because the specific locking device of the pin, c, on the compressor bar, and the lip, c', on the extended end of the binding arm, which constitutes the alleged invention, was anticipated by the locking devices found in the John F. Appleby patent of June 1, 1869, and the S. D. Locke patent of December 7, 1869; and because said reissue patent, if valid to any extent, is not infringed by the defendants' locking device, which is substantially the same as that of the Appleby 1869 patent. All that Baker did was to put a pin on the compressor bar, and a lip on the binding arm, so as to lock the two pivoted arms at a certain desired position, or degree of openness. This involved no invention. Long before the Baker patent, pivoted arms had been locked in substantially the same way. One of the complainant's experts is compelled to admit that this locking contrivance was old. When a device has been employed for one purpose, it is not invention to apply it to another analogous purpose. This is well settled. Roberts v. Ryer, 91 U. S. 157, and Blake v. City and County of San Francisco, 113 U. S. 682, 5 Sup. Ct. Rep. 692.

If the Baker patent had any validity, it could not be so construed as to cover defendants' locking device without being met by the Appleby and Locke patents as anticipating devices. Claims 1, 2, 3, and 4 of the Baker reissue are manifestly void, unless construed to mean the same thing as claim 5, which is a repetition of the single claim of the original patent. This was recognized by the complainant's experts, who were driven to place upon said claims the same construction as that given to the fifth claim. The reissue is valid for the old claim, only. Gage v. Herring, 107 U. S. 640, 2 Sup. Ct. Rep. 819. But, as already stated, the device covered by that claim is wanting in patentable novelty, was anticipated by the prior art, and is not infringed by the defendants; so that no case for relief is made by complainant on said Baker reissued patent.

Secondly, that complainant is entitled to no relief on the Marquis L. Gorham patent, No. 159,506, for improvements in grain binders, issued February 9, 1875, for various reasons, which will be briefly outlined. The claims of this patent, which are relied on and

alleged to have been infringed, are the 3d, 10th, 11th, 25th, and 26th. It is shown by the record that the owners of the Gorham patent, in 1881, before its transfer and assignment to the complainant, filed an application in the patent office for a reissue thereof, which contained claims substantially, if not identically, the same as said original claims here involved, together with other claims which sought to broaden and enlarge the scope and bearing of said original claims. In acting upon this application, the patent office not only denied the broader claims sought to be secured, but rejected the claims which were either a literal or substantial repetition of said claims, 3, 10, 11, 25, and 26 of the original patent, on which the present suit is based. This rejection was rested or predicated by the examiner on reference to various prior patents. The owner of the Gorham patent took no appeal from this decision or adverse action of the patent office, but acquiesced in the same, and thereafter requested and obtained a return of the original letters patent; leaving the decision of the examiner, rejecting both said original claims, and the new claims presented to broaden the same, in full force and operation.

Now, what is the legal effect of this proceeding, and of the adverse action or decision of the department thereunder, upon said claims 3, 10, 11, 25, and 26? In withdrawing or securing a return of the original letters patent after an adverse decision by the patent office on said claims, is the patentee, or his successor in right and interest, entitled to assert the validity of said claims, or insist upon the benefit thereof, unaffected by the reissue proceeding and such adverse action? We think not. It is well settled that the rejection of such claims on an original application, and acquiescence in such rejection, would conclude the patentee in respect thereto. Sutter v. Robinson, 119 U. S. 541, 7 Sup. Ct. Rep. 376; Shepard v. Carrigan, 116 U. S. 597, 6 Sup. Ct. Rep. 493. The same principle should apply in a case like the present, where a party voluntarily resubmits his patent to the examination and revision of the patent office, and acquiesces in a rejection of certain claims thereof, or in a construction placed thereon which operates to restrict or narrow the patent. There is no distinction, in principle, between an acquiescence in an adverse decision in order to secure a patent in the first instance, and a like acquiescence in the rejection of claims reopened and resubmitted to the jurisdiction of the patent office under reissue applications. In each case the patentee is entitled to only what the office allows. By section 8 of the patent act of 1837, it was provided that, whenever a patent should be returned for reissue, the claims thereof should be subject to revision and restriction in the same manner as were original applications for patents. This provision was substantially repeated in section 53 of the patent act of 1870, which is re-enacted in section 4916, Rev. St. While it is provided by this section that "the surrender shall take effect upon the issue of the amended patent," it is also further provided that on application for reissue "the specification and claim, in every such case, shall be subject to revision and restriction in the same manner as

original applications are." These two provisions of said section were under consideration in Peck v. Collins, 103 U. S. 665, and in respect to the former the supreme court left open the question whether, in cases where a reissue is refused on some formal or other ground which did not affect the original claim, an applicant could have a return to his original patent, while, in respect to the latter provision, making the specifications and claims subject to revision and restriction in the same manner as original applications, the court said:

"But if his [the patentee's] title to the invention is disputed, and adjudged against him, it would still seem that the effect of such a decision should be as fatal to his original patent as to his right to a reissue."

The original claims 3, 10, 11, 25, and 26, having been voluntarily resubmitted to the revising jurisdiction of the patent office by the application for reissue, which repeated them literally or in substance, and having been rejected or adjudged against the patentee, not on formal grounds, but for reasons and on reference to prior patented devices which went to his right and title to such claims, and no appeal having been prosecuted from that decision, as the applicant could have done under sections 4909–4911, etc., of the Revised Statutes, the effect of such adverse decision by the patent office should be regarded as fatal to said claims, to the same extent as their rejection upon the original application would have been. If, as seems clear, the reissue application placed these claims within the jurisdiction and power of the patent office to revise or restrict, and the office, while possessed and in the exercise of such jurisdiction, decided against the patentee's right and title to such claims, he had two courses open to him: He could seek a reversal of the examiner's action, or acquiesce in the rejection. If he elected the latter course, and took back the original letters patent, with such adverse decision remaining in force, his action, in legal effect, operated to exclude the rejected claims as parts of the patent. The return of the letters patent, under such circumstances, could not restore validity to said claims, or reinstate them to the same position or status they occupied before the reissue application was filed. The withdrawal of the letters patent after adverse action on the claims presented should be treated as an amendment thereof, to the extent of the original claims rejected. The language of the statute conferring jurisdiction upon the patent office to revise and restrict the claims presented in such cases; the decisions of the supreme court upon the effect of acquiescence on the part of the applicants in adverse decisions and rulings of the patent office; sound principle and good policy,—support this view of the subject. Patentees should not be allowed to experiment and take chances in attempts either to secure reissues, or to extend, enlarge, or broaden their inventions, without taking the risk, and subjecting themselves to the same rules and principles which apply and govern in original applications. Our conclusion is that the adverse action of the department upon said claims, with the patentee's acquiescence therein, operated to invalidate the same.

But if said claims survived the revisory action and rejection

thereof by the patent office under the reissue application, still the unsuccessful attempt made in that proceeding to broaden or expand said claims must, upon well-settled principles, be held to so limit and restrict their construction as to exclude what was thus rejected, and to confine them to the specific devices and combinations therein described. Said claims must also be read and construed in the light of the prior art, which, as disclosed by the record, was such as to render Gorham simply an improver, rather than an original and primary inventor. Assuming the validity of the several claims relied on, and applying thereto the tests and principles indicated, the court is clearly of the opinion that complainant is not entitled to the relief sought thereon. The third claim is for "the reciprocating segments, $C^4$, having the feed teeth, $C^6$, in combination with the guides, D, as and for the purposes specified." This language is too plain to admit of doubt, or leave any room for construction, even if there had been no reissue application seeking to give it broader scope. The arrangement and organization of the Gorham machine was such as to require or necessitate the adoption of this or some similar device for moving the grain from the receiving chamber through the machine towards the binding or bundling chamber, and the device described as applied to that machine had its special or peculiar advantages. There is nothing in either the claim or the specification to support complainant's theory that the device or mechanism described in the claim covered or embraced what is alleged to have been Gorham's real invention, viz. the packing of the grain in small quantities, or wisp by wisp, at the waist or middle portion of the gavel or bundle, together with the self-sizing thereof as it reached the binding receptacle. The claim, by its very terms, includes only the elements of the reciprocating segments having the feed teeth pivoted thereto, and the guides along the passageway through the machine; and the purpose or function intended to be accomplished or performed by the combination was not the central packing of the grain, or the self-sizing of the bundle, but merely the movement or transportation of the grain from the receiving chamber through the machine, without regard to packing it wisp by wisp, and without reference to any binding receptacle at the end of the passageway traversed by the grain. The reciprocating segments, with the feed teeth pivoted thereto or thereon, performed the simple function of carriers from the receiving chamber across the machine, and without which it would have been inoperative. Aside from the unsuccessful attempt in the reissue proceeding to expand this claim, the state of the art, as shown by the prior patents of Low & Adams, Glover, Gordon, the Whitneys, and others, limits and restricts the patentable novelty of said claim to the use of literal reciprocating segments, with their pivoted teeth. Again, the several elements which go to make up the combination of this third claim, as of the other claims relied on, are mentioned specifically and by reference letters. Such specific reference operates to confine and restrict the claim to the particular device described. Weir v. Morden, 125 U. S. 106, 8 Sup. Ct. Rep. 869, and Hendy v. Iron Works, 127 U. S. 375, 8 Sup. Ct. Rep. 1275.

The third claim of the patent, being confined and limited to the literal reciprocating segments arranged upon pivotal points independent of the actuating crank shafts, and carrying the pivoted feed teeth upon them, is not infringed by the defendants' device, which presents an entirely different structure or mechanism, performs a different function, and could not be made to serve the purpose, or to accomplish the same results. The defendants' device would not operate on a horizontal deck or platform like that of the Gorham machine. It has no segments and no feeding teeth pivoted thereon. It is not pivoted on points separate from the crank shaft which actuates it, but is mounted on the actuating crank shaft. In the defendants' device, there is no mechanism which performs the function of moving or carrying the grain from the receiving chamber through the machine into the chamber or receptacle in which the bundle is formed and bound. The differences between the two devices are too wide and radical to involve infringement, in view of the prior art. If said third claim could be construed to cover the defendants' device, it would itself be anticipated by the Gordon patent, No. 157,967, and other prior devices referred to in the evidence. The third claim, if valid, is not infringed.

The tenth and eleventh claims read as follows, viz.:

(10) "The flexible strap, g, arranged in receptacle, G, to operate the trip lever, H, in the manner substantially as and for the purpose described." (11) "The combination of the binding strap and cord, g, with the bundle receptacle, G, and toothed feeding segments, C⁴, substantially as and for the purposes described."

These two claims, as explained by the experts on both sides, are substantially the same, each having the same elements in combination. The elements specially described and covered by said claims are (1) the reciprocating segments provided with pivotal feeding teeth; (2) the flexible strap lying in the bundling or binding receptacle; and (3) the cord fastened to the end of said strap, and so arranged as to operate the trip lever, or draw it back to such extent as to throw the proper clutches into engagement, and start the binding mechanism. The same reasons and considerations stated above for limiting the third claim to the specific device described therein apply with equal force to the device covered by or embraced in the tenth and eleventh claims. The elements which go to make up the combination of said claims are so clearly stated as to admit of no doubt as to the proper construction of the claims. They are mentioned specifically and by reference letters, leaving no room to question what was intended. 125 U. S. 106, 8 Sup. Ct. Rep. 869, and 127 U. S. 375, 8 Sup. Ct. Rep. 1275. The owner of the patent in the reissue application recognized that said claims were limited to a flexible strap arranged in the bundle chamber. The claims were so construed as not to include a metallic arm or finger, which was sought to be secured under new and broader claims, calling generally for "a yielding mechanism capable of expanding under the pressure of the infed grain." The patent office held, in substance, that a "flexible strap" was, in view of the state of the art, something different from

a yielding metallic arm, and denied the claims which sought to cover "yielding mechanism" such as defendants employ. Complainant cannot, in view of the specific description of the claims, and of this action of the department, invoke in behalf of said claims the doctrine of equivalents, so as to extend them beyond the particular devices described.

Again, the Spaulding patent of 1870 disclosed the idea of self-sizing the bundles, and the automatic setting of the binding devices into operation through the instrumentality of a yielding metallic finger or fingers. In his specifications he stated, among other things, that "this invention consists, principally, in a mechanism that binds the gavel in the same movement that scrapes it from the binding table; also, in a mechanism that always produces gavels of the same size; also, in an automatic device for giving motion to the binding apparatus that receives its motion from the accumulation of grain." This Spaulding specification further says:

"As soon as the quantity of cut grain beneath the compressing fingers becomes too great for them to restrain, it lifts them, such lifting up being effected in every instance by precisely the same amount of grain."

The complainant has made a vigorous attack upon this Spaulding patent, and claims that a machine constructed in conformity therewith would not operate. The proof does not establish this proposition, and complainant's own acts and representations, as the owner and licensee of said patent, are inconsistent with the present attempt to impeach its validity. In respect to the features under consideration,—those relating to the self-sizing of the bundles; the employment of yielding metallic arms or fingers, against which the grain is pressed to thereby automatically impart motion to the binding apparatus,—the Spaulding machine was operative, as the evidence in the record clearly establishes. This prior Spaulding device seems to restrict the Gorham device covered by said claims to the specific and particular means described therein. Complainant cannot be allowed to invoke for said claims the doctrine of equivalents, so as to have them construed to cover what was clearly disclosed in the Spaulding patent.

Again, it is shown that in July, 1878, Gorham applied for, and on October 12, 1880, obtained, a patent, No. 233,089, in which he secured claims for a yielding metallic arm in place of the flexible strap. It further appears that, in the application for the second patent, it was urged that there was a difference between the flexible strap of the first patent, here sued on, and a yielding metallic arm. This alleged difference was presented as a reason for granting the second patent. This action on the part of the patentee and the patent office was at least a recognition that there was a patentable difference between a flexible strap and a yielding metallic arm, and may fairly be invoked to limit complainant to the special means described in said claims, under the doctrine of McClain v. Ortmayer, 141 U. S. 423, 12 Sup. Ct. Rep. 76.

Said tenth and eleventh claims, being restricted to the reciprocating segments with pivoted teeth and flexible strap, and cord connected therewith, and the binding apparatus, the device employed

by the defendants does not infringe the same, because the defendants' mechanism has neither the reciprocating segments with pivoted teeth, nor flexible strap or cord. They have a different feeding device, and, instead of a flexible strap and cord, they employ yielding metallic fingers, like those of the Spaulding patent of 1870. Said tenth and eleventh claims, if valid, are not infringed by defendants.

The twenty-fifth and twenty-sixth claims of the patent, without introducing the tying bill as an element of the combination described therein, refer only to the mechanism by which the cord, after it is tied around the completed bundle, is cut and removed from the tying bill. They read as follows:

"(25) The combination of arm, Q, on shaft, $K^2$, with arm, $R^1$, and bent arm, $R^2$, on rock shaft, R, and carrying the projecting cord arm, $V^3$, to force the cord from the knot-tying device, substantially as described. (26) The combination of arm, Q, on shaft, $K^2$, with arm, $R^1$, and bent arm, $R^2$, on rock shaft, R, carrying the knife, $V^1$, for cutting the cord, and arm, $V^1$, for forcing the cord off the hook, substantially as described."

The knife being read into the twenty-fifth claim, as it should be, these two claims are substantially alike; and for the reasons already stated in reference to the third, tenth, and eleventh claims, are limited to combinations in which an arm is mounted upon and rotated with the shaft, which rotates the knotter bill to move the cord cutter and stripper. It described a special mechanism for cutting and stripping the cord immediately after the knot has been tied. Devices of various kinds were in use, long prior to Gorham, for cutting the cord, and stripping it from the knotter hook. Means for actuating such cutters and strippers were also old in the art. The prior method for moving the cutter and stripper from the tying bill was by means which operated separately or independently of the knotter shaft, or shaft which rotated the knotter bill. These prior devices are disclosed in the Hickey, 1860, patent, and the Greenhut, 1868, patent. The prior state of the art, and the rulings of the patent office on the reissue application, particularly on claims 57 and 59 thereof, which were rejected on the Burson patent of 1860, and the McPherson, 1870, patent, operate to restrict said claims 25 and 26, or the combination therein described, to an arm for moving the cutter and stripper, that is mounted upon and rotated by and with the knotter shaft. In view of the prior art, and of the proceedings had in the patent office, the particular arrangement described constituted the only novelty of said claims. Again, the defendants do not infringe said twenty-fifth and twenty-sixth claims, for the reason that their device for moving or actuating their cutters and strippers is not mounted upon, or rotated by or with, the knotter shaft, but by means of a mechanism that is extraneous to, and operated independently of, the knotter shaft. Defendants' actuating means for cutting and stripping the cord from the tying bill corresponds, substantially and in principle, with the devices shown in the prior patents of Hickey, Sherwood, Holly, and others. That these former devices were connected with wire binders, and that the cutting apparatus had to deal with wire instead of cord, involves

no distinction in principle, but rather tends to support the view that the novelty disclosed by the twenty-fifth and twenty-sixth claims is confined to the special and particular arrangement therein described, which defendants do not adopt. There is no infringement of said claims by the defendants.

The conclusion of the court, upon the whole case, is that complainant is not entitled to any relief on either of the patents sued on, or upon any claim or claims thereof, and that in both cases its suit or bill should be dismissed, with costs in each cause to be taxed against it, and it is accordingly so ordered and decreed.